UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

COLLEEN C. PICCONE and      )
PETER V. QUAGLIA,           )
        Plaintiffs,         )
                            )
        v.                  )      Civ. A. No. 11-10143-MLW
                            )
JOHN W. BARTELS, JR.,       )
        Defendant.          )

MEMORANDUM AND ORDER

WOLF, D.J.                                      August 25, 2014

I.   OVERVIEW

        Plaintiffs Coleen Piccone and Peter Quaglia are employees
of Customs and Border Patrol ("CBP"), a component of the
Department of Homeland Security ("DHS"). Piccone's brother,
Louis, lived in Dalton, Massachusetts with his wife, Elena, and
their three children.[1] In 2008, Louis was investigated for child
abuse. Louis and Elena left the state with their children.
Warrants were issued for their arrest.

        On February 1, 2008, plaintiffs encountered defendant John
Bartels, Chief of the Dalton Police Department, at Louis and
Elena's home. The encounter was confrontational. Soon
thereafter, Bartels telephoned the Office of the Inspector
General at DHS to complain about plaintiffs' behavior on that

---

[1]     In this Memorandum, the name "Piccone" is used to
refer only to plaintiff Colleen Piccone, not to her brother or
sister-in-law.

occasion. Bartels also indicated that he believed that Piccone knew where Louis and Elena were.

Plaintiffs brought the instant suit, asserting various claims against Bartels and other defendants. The only defendant remaining in plaintiffs' Amended Complaint (the "Complaint") is Bartels, and the only claims remaining against Bartels are slander and interference with advantageous business relations ("IABR"). Bartels moves for summary judgment, arguing, among other things, that his statements to the DHS about plaintiffs were non-actionable expressions of opinion.

For the reasons explained in this Memorandum, the court is allowing the motion for summary judgment. The essence of these reasons is as follows.

First, as a matter of Massachusetts common law, neither true statements nor "pure" expressions of opinion, meaning those that do not imply the existence of undisclosed facts, are actionable. This rule is also mandated by the First Amendment, at least in cases involving public officials, public figures, or matters of public concern. The transcript of Bartels's conversation with the DHS establishes beyond genuine dispute that Bartels's statements were "pure" expressions of opinion based on disclosed, true facts. Accordingly, Bartels's statements are not actionable under Massachusetts common law.

A Massachusetts statute, Mass. Gen. Laws ch. 231, §92 (the "Actual Malice Statute"), permits a plaintiff to recover for damaging statements that would not ordinarily be actionable if the statements were made with "actual malice," in the sense of ill will or malevolent intent. The evidence in the record creates a genuine dispute as to whether Bartels acted with actual malice. However, some authority indicates that the Actual Malice Statute applies only to claims of libel, not to claims of slander. More significantly, the Actual Malice Statute cannot constitutionally be applied to "public officials." The undisputed facts demonstrate that Piccone and Bartels are both public officials in the relevant sense, primarily because their respective positions involve substantial responsibility for important governmental affairs. Therefore, the Actual Malice Statute does not save plaintiffs' defamation claim.

Summary judgment is appropriate on plaintiffs' IABR claim for related reasons. The Supreme Court has held that the constitutional limitations on the types of speech subject to liability for defamation also apply to claims for intentional infliction of emotional distress. Lower courts have extended this rule to additional torts, including IABR. First Circuit decisions indicate that the First Circuit would take the same approach. Because Bartels's statements are pure expressions of opinion, recovery for defamation for these statements is

constitutionally impermissible because plaintiffs are public officials. Accordingly, plaintiffs cannot recover for the same statements on a theory of interference with advantageous business relations.

The court recognizes that this case is, for two reasons, not a prototypical suit for defamation by public officials. First, the statements made about plaintiffs concerned their private affairs, not their actions in their official capacities. Second, the statements about plaintiffs were not made publicly, for example through the media, but rather only to a limited audience -- specifically, a member of an Inspector General's office. The constitutional limits on defamation suits by public officials apply nevertheless. The Supreme Court has stated that:

> The public-official rule protects the paramount public interest in a free flow of information to the people concerning public officials, their servants. To this end, anything which might touch on an official's fitness for office is relevant. Few personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character.

Garrison v. State of La., 379 U.S. 64, 77 (1964). In essence, the instant case concerns the provision of information potentially germane to public officials' fitness for office to a government inspector. The provision of such information to appropriate bodies is part of the "free flow of information"

that is of "paramount" importance to the public. Id. As in other situations to which the "public-official rule" applies, "occasional injury to the reputations of individuals must yield to the public welfare." New York Times v. Sullivan, 376 U.S. 254, 281 (1964) (quoting Coleman v. MacLennan, 98 P. 281, 286 (Kan. 1908)).

II.  THE SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A factual dispute, therefore, precludes summary judgment if it is "material" and "genuine." See Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986).

A fact is "material" if, in light of the relevant substantive law, "it has the potential of determining the outcome of the litigation." Maymi v. Puerto Rico Ports Auth., 515 F.3d 20, 25 (1st Cir. 2008); Martinez-Rodriguez v. Guevara, 597 F.3d 414, 419 (1st Cir. 2010). "Only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

To determine if a factual dispute is "genuine," the court must assess whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Chadwick v. WellPoint, Inc., 561 F.3d 38, 43 (1st Cir. 2009) (quoting Anderson, 477 U.S. at 248); Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009). In making this determination, the court must "constru[e] the record in the light most favorable to the non-moving party" and "tak[e] all reasonable inferences in [the non-moving party's] favor." Douglas v. York Cnty., 433 F.3d 143, 145, 149 (1st Cir. 2005); Montalvo v. Gonzalez-Amparo, 587 F.3d 43, 46 (1st Cir. 2009). The record must not be scrutinized piecemeal. Rather, it must be "taken as a whole." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Kelly v. Cort Furniture, 717 F. Supp. 2d 120, 122 (D. Mass. 2010). Evidence submitted in inadmissible form may be considered only if it could be presented in a form that would be admissible at trial. See Federal Rule of Civil Procedure 56(c)(2); Gorski v. New Hampshire Dep't of Corr., 290 F.3d 466, 475-76 (1st Cir. 2002); Vazquez v. Lopez-Rosario, 134 F.3d 28, 33 (1st Cir. 1998).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of

material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). However, the moving party's burden "may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." <u>Id.</u> at 325. Summary judgment is, therefore, mandated "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Id.</u> at 322; <u>Gorski</u>, 290 F.3d at 475-76; <u>Smith v. Stratus Computer, Inc.</u>, 40 F.3d 11, 12 (1st Cir. 1994).

III. BACKGROUND

    A.   <u>Facts</u>

The following facts are not generally disputed. Certain factual disputes are discussed below.

Piccone is the Deputy Associate Chief Counsel to Customs and Border Protection in New York. <u>See</u> Piccone Dep. at 113. Quaglia, who was Piccone's boyfriend at the time of the events relevant to this case, is the Special Agent in Charge for the CBP's Office of Internal Affairs in New York. <u>See</u> Quaglia Dep. at 8, 9.

In 2008, Piccone's brother, Louis, was accused of child abuse. These allegations were investigated by the Dalton Police Department and by the Massachusetts Department of Children and

Families (the "DCF"). While the investigation was being conducted, Louis and his wife, Elena, left the state with their children. Arrest warrants were issued for Louis and Elena on charges of kidnapping a minor by a relative. See Am. Compl. Exs. B, C. In addition, the local Family Court issued an order granting the DCF temporary custody of Louis and Elena's children.

Piccone submitted an application to the Family Court requesting that Louis and Elena's children be placed temporarily in her custody at Louis and Elena's home. On February 1, 2008, plaintiffs travelled to Dalton to attend a hearing on Piccone's custody application. In Dalton, they were informed by a probation officer, William Gail, that a carbon monoxide detector would need to be installed in Louis and Elena's home in order for it to be considered a suitable site for the children. Plaintiffs purchased a carbon monoxide detector and drove to Louis and Elena's home to install it.

When plaintiffs arrived at Louis and Elena's home, they encountered Bartels and Dalton Police Department Officer Jeffrey Coe. Bartels and Coe were at Louis and Elena's home seeking information concerning Louis and Elena's location. Plaintiffs then had an unpleasant interaction with Bartels. Bartels demanded that plaintiffs identify themselves. Plaintiffs similarly sought explanations concerning the police officers'

identities and activities. Bartels prevented plaintiffs, at first, from entering Louis and Elena's home. After speaking to Mr. Gail, who confirmed that plaintiffs had been told to install a carbon monoxide detector in the home, Bartels permitted Quaglia to enter. Bartels then sought to enter the home as well, but Quaglia insisted that Bartels remain outside.

Later that day, Bartels spoke by telephone with Matthew Carbone, of the Office of the Inspector General at DHS, to complain about defendants' conduct.[2] Bartels's remarks included essentially two themes. First, Bartels told Carbone that, in his view, plaintiffs had acted unprofessionally. His discussions with Carbone on this topic are characterized by the following statements:

> BARTELS: . . . [T]here were a lot of questions as for what authority we had. . . . [I]t seemed like they didn't feel that we had the authority to tell them no you're not going into the house . . . I mean it was just kind of more of a hassle than we needed to go through. . . . [Q]uite frankly they [could have] said well you know we were just at juvenile court and [Probation Officer] Bill Gail had come up here and -- and dadadadada and we were told to go -- to go into the house to do this. . . . You know things like that to make things a little bit easier on us.

> (Conversation Tr. at 18-19.)

---

[2]     The Complaint also alleges that Bartels "discussed with an officer of the Massachusetts State Police Quaglia's 'assistance' to fugitives." Complaint ¶24; see also Piccone Dep. at 58, 65. However, plaintiffs have not reiterated or supported this allegation, in writing or at oral argument, in response to the motion for summary judgment.

BARTELS:  . . . [W]e finally had [a] conversation with
          uh juvenile probation confirming the fact that
          they were trying to petition for foster parent or
          at least Colleen was. To be a foster parent. And
          uh that they could be -- and they were uh could
          be at the house to install the CO detector.
          . . .

CARBONE:  OK. So their story did pan out.

BARTELS:  It did.

CARBONE:  It's just that they really weren't too
          social about it.

BARTELS:  No. They weren't.

                        (Id. at 15-18.)


BARTELS:  . . . [I]t was . . . I think a little bit
          more than what we needed to go through. Um.

CARBONE:  Uh clearly unprofessional conduct on their
          -- on their part uh.

BARTELS:  On that level yes. Now to uh um Mr.
          Quaglia's credit, he apologized at the end of all
          this.

CARBONE:  OK.

BARTELS:  Uh and he said you know . . . we're at a
          high stress level. Uh and uh you know he said
          he's been up all night. He drove all night to get
          here. . . . I can understand that. And I uh told
          him that. . . .

CARBONE: Right.

BARTELS: Uh so um all in all they left in an amicable
         fashion. . . .

                        (Id. at 19-20.)


Bartels also complained that, for the same reasons, he felt that

plaintiffs had not extended him "professional courtesy." See

Conversation Tr. at 29, 33.

                            10

The second theme in Bartels's remarks was his belief that Piccone might have known where Louis and Elena, and/or their children, were. Bartels and Carbone had the following exchanges about this matter:

> CARBONE:  [D]id you guys believe that um Quaglia or Colleen knew where the parents were?
>
> BARTELS:  We didn't ask them specifically.
>
> CARBONE:  But you guys know the parents are wanted so I mean --
>
> BARTELS:  Well, we even -- we even told them while we were there that there were two warrants, arrest warrants for them. . . . I can't believe -- they've been involved in this thing since the get-go. And I believe it was Colleen's house . . . which was searched by NYPD . . . So not to know that there are warrants, I don't know. You know? . . .
>
> CARBONE:  Is it fair to presume that she probably knows where they are, she's trying to get the uh foster or adoption paperwork done so that she can amicably take custody of the kids and then the parents would turn themselves in? Or --
>
> BARTELS:  Yes.
>
> CARBONE:  I mean is that like all implied?
>
> BARTELS:  I think that's their motive. Uh I think they want to uh get the kids situated. And then let uh the parents uh you know deal with their criminal charges here.
>
> (Conversation Tr. at 21-23.)

> CARBONE:  Do you know, chief, that they know that they're wanted?
>
> BARTELS:  Do I know . . . specifically that I know they do? . . . Or that I think they do?
>
> CARBONE:  Right (inaudible).
>
> BARTELS:  No I don't know that. I can't say that's -- that's -- that's -- that in my mind. How -- how

would I prove that they actually know where they
are? Or that they're hiding them? No, I don't.

CARBONE:  Right.

BARTELS:  But I'm assuming that they know where they
are, only because they're here trying to help get
one, custody at the custody hearing that . . .
Louis was summonsed to.

CARBONE:  Right.

BARTELS:  He was told it was going to take place on
the first of February. Uh and um Louis didn't
show but hey you know [his] sister did. . . .

CARBONE:  Right.

BARTELS:  So um uh this is -- yes assumption, yes
circumstantial.

(<u>Id.</u> at 30-32.)


Bartels's call to Carbone led to investigations by the
Office of the Inspector General at DHS, the Office of
Professional Responsibility at Immigration and Customs
Enforcement ("ICE"),[3] and the Office of Investigative Affairs at
CBP. These investigations did not result in any official action
against either plaintiff. <u>See</u> Piccone Dep. at 162-65.

B.  <u>Procedural History</u>

Plaintiffs brought suit on January 26, 2011, alleging, in
essence, that Bartels's statements to Carbone were defamatory,
and that those statements injured plaintiffs' reputations and
hindered their professional advancement. Plaintiffs asserted

---

[3]  ICE, like CBP, is a component of DHS. The Office of
Professional Responsibility housed at ICE oversees
investigations concerning both ICE and CBP. <u>See</u> Piccone Dep. at
161.

state-law claims of slander and libel (Count I), malicious falsehood (Count II), IABR (Count III), violations of the Massachusetts right to privacy statute (Count IV), and intentional infliction of emotional distress (Count V).

Plaintiffs initially named the Dalton Police Department and the Town of Dalton as additional defendants. When those defendants filed a motion to dismiss, plaintiffs amended their complaint to leave Bartels as the only defendant.

Bartels moved to dismiss. His motion was referred to Magistrate Judge Kenneth P. Neiman, who issued a Report and Recommendation proposing partial dismissal. Bartels filed objections to the Report and Recommendation. The court denied Bartels's objections and adopted the Report and Recommendation. The court found that malicious falsehood (Count II) is not recognized as an independent cause of action in Massachusetts, and that plaintiffs had failed to state claims of violations of the right to privacy statute (Count IV), intentional infliction of emotional distress (Count V), and libel (part of Count I).

The court denied the motion to dismiss with regard to slander (part of Count I) and IABR (Count III). In essence, the court found that Bartels's statements to the DHS might have been expressions of opinion, but might also be proven to be actionable as statements that "impl[y] the allegation of undisclosed defamatory facts as the basis for the opinion."

<u>Piccone v. Bartels</u>, Civ. No. 11-10143-MLW, 2012 WL 4592770, at
*2 (D. Mass. Sept. 29, 2012) (quoting <u>Nat'l Ass'n of Gov't Emp.,</u>
<u>Inc. v. Cent. Broad. Corp.</u>, 396 N.E.2d 996, 1000 (Mass. 1979)).[4]

After discovery was complete, Bartels filed the instant
motion for summary judgment. Bartels argues that the evidence in
the record establishes beyond genuine dispute that he made no
actionable statements to Carbone. In addition, Bartels contends
that plaintiffs have made no showing that Bartels's remarks to
Carbone were made negligently or with the "actual malice"
required if, as Bartels contends, plaintiffs are "public
officials" for purposes of defamation law. Bartels also asserts
that the record refutes plaintiffs' claim that their careers
were injured as a result of his conversation with Carbone.

As for plaintiffs' IABR claim, Bartels argues that this
cause of action cannot succeed because plaintiffs' business
relations with DHS remain intact, and because plaintiffs cannot
prove that they have suffered any disadvantage as a result of
Bartels's actions.

---

[4]    Similarly, the court found that Bartels's alleged
comment about plaintiffs to a State Trooper might or might not
be privileged as a statement "made to police or prosecutors
prior to trial . . . in the context of a proposed judicial
proceedings." <u>Piccone</u>, 2012 WL 4592770, at *3 (quoting <u>Burke v.</u>
<u>Town of Walpole</u>, 405 F.3d 66, 94 (1st Cir. 2005)). As noted
earlier, plaintiffs have abandoned the Complaint's allegation
about this statement by Bartels.

Plaintiffs oppose the motion for summary judgment, arguing that genuine disputes exist as to material facts, including whether Bartels's statements to Carbone were pure expressions of opinion, whether Bartels acted with actual malice, and whether plaintiffs suffered injury as a result of Bartels's actions.

A hearing on the motion for summary judgment was held on August 15, 2014, and the motion was taken under advisement.

IV. SLANDER

A. The Common Law Tort, and the Exception for Expressions of Opinion

Slander is "defamation through oral communication." Noonan v. Staples, 707 F. Supp. 2d 85, 89 (D. Mass. 2010) (citing Ellis v. Safety Ins. Co., 672 N.E.2d 979, 983 (Mass. App. Ct. 1996)). The elements of a defamation claim under Massachusetts law are:

> (1) that "[t]he defendant made a statement, concerning the plaintiff, to a third party"; (2) that the statement was defamatory such that it "could damage the plaintiff's reputation in the community"; (3) that "[t]he defendant was at fault in making the statement"; and (4) that "[t]he statement either caused the plaintiff economic loss . . . or is actionable without proof of economic loss."

Shay v. Walters, 702 F.3d 76, 82 (1st Cir. 2012) (quoting Ravnikar v. Bogojavlensky, 782 N.E.2d 508, 510-11 (Mass. 2003)); Damon v. Moore, 520 F.3d 98, 103 (1st Cir. 2008). Subject to an exception discussed below, "[t]ruth is an absolute defense to a defamation action under Massachusetts law." Mass. Sch. of Law at

Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 42 (1st Cir. 2006);

Noonan v. Staples, Inc., 556 F.3d 20, 26 (1st Cir. 2009).

Under the Supreme Court's First Amendment jurisprudence, the degree of "fault" that must be proven in order to support a permissible action for defamation hinges on the plaintiff's status. "Short of imposing liability without fault, states may define appropriate standards regarding defamation of private individuals." Shay, 702 F.3d at 82. On the other hand, since New York Times v. Sullivan, 376 U.S. at 279-80, "public officials and public figures may only recover if they can prove that the publication that harmed them contained a false statement of fact that was made with actual malice." Fiacco v. Sigma Alpha Epsilon Fraternity, 528 F.3d 94, 99 (1st Cir. 2008). "Actual malice," in this context, means "knowledge of or reckless disregard for the falsity of the statement." Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122, 127 (1st Cir. 1997).

The Supreme Court has repeatedly reserved judgment on the constitutional standards that govern defamation suits against non-media defendants. See Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 n.6 (1990); Phila. Newspapers, Inc. v. Hepps, 475 U.S. 767, 779 n.4 (1986); Hutchinson v. Proxmire, 443 U.S. 111, 133, n.16 (1979). Justice William Brennan, however, stated that any distinction between media defendants and non-media defendants "is 'irreconcilable with the fundamental First

16

Amendment principle that "[t]he inherent worth of . . . speech in terms of its capacity for informing the public does not depend upon the identity of the source, whether corporation, association, union, or individual."'" Milkovich, 497 U.S. at 24 n.2 (Brennan, J., dissenting) (quoting Hepps, 475 U.S. at 780 (Brennan, J., concurring), and First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 777 (1978)). Lower courts, including the Second, Fourth, and Eighth Circuits, have adopted this approach. See Flamm v. Am. Ass'n of Univ. Women, 201 F.3d 144, 149 (2d Cir. 2000); Snyder v. Phelps, 580 F.3d 206, 220 (4th Cir. 2009), aff'd, 131 S. Ct. 1207 (2011); In re IBP Confidential Bus. Documents Litig., 797 F.2d 632, 642 (8th Cir. 1986); McMann v. Doe, 460 F. Supp. 2d 259, 269 n.62 (D. Mass. 2006); David A. Elder, Defamation: A Lawyer's Guide §7:4 (2013) (collecting cases). The court finds these decisions persuasive and, therefore, concludes that the constitutional limitations on the speech that can support liability for defamation apply in cases involving non-media defendants.

"The [Supreme] Court has . . . held that only statements that present or imply the existence of facts that can be proven true or false are actionable under state defamation law." Gray v. St. Martin's Press, Inc., 221 F.3d 243, 248 (1st Cir. 2000) (citing Milkovich, 497 U.S. at 18-20); see also Phantom Touring, Inc. v. Affiliated Publications, 953 F.2d 724, 728 (1st Cir.

17

1992) (a statement is generally not actionable if it is "not susceptible of being proved true or false"); Levinsky's, 127 F.3d at 127 ("a statement normally is not actionable unless it contains an objectively verifiable assertion"). Accordingly, "[a]n 'expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation.'" Yohe v. Nugent, 321 F.3d 35, 41 (1st Cir. 2003) (quoting Dulgarian v. Stone, 652 N.E.2d 603, 608 (Mass. 1995)). In other words, a statement:

> is not actionable if "it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts . . . ." As the Ninth Circuit has explained, "when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment."

Riley v. Harr, 292 F.3d 282, 289 (1st Cir. 2002) (quoting Gray, 221 F.3d at 248; Partington v. Bugliosi, 56 F.3d 1147, 1156–57 (9th Cir. 1995)).

However, the Supreme Court has declined to recognize a "wholesale defamation exemption for anything that might be labeled 'opinion,'" essentially because "expressions of 'opinion' may often imply an assertion of objective fact." Milkovich, 497 U.S. at 18. Thus, only "pure" expressions of

opinion, meaning those that do not imply the existence of undisclosed facts, are barred from supporting a defamation claim. "A statement couched as an opinion that presents or implies the existence of facts which are capable of being proven true or false," on the other hand, "can be actionable." Levinsky's, 127 F.3d at 127.

Massachusetts law implements these principles by "immuniz[ing] statements of opinion based on fully disclosed nondefamatory facts." Phantom Touring, 953 F.2d at 731 n.13 (citing cases); Nat'l Ass'n, 396 N.E.2d at 1000; Howell v. Enterprise Publ'g Co., 920 N.E.2d 1, 27-28 (Mass. 2010). Massachusetts precedents instruct courts to follow a two-step process in their analysis of statements that may be expressions of opinion. First, the court must "determine if the [statement] qualifies as an expression of opinion. If unambiguous, this is a determination of law for the court. . . ." Howell, 920 N.E.2d at 28 (citing Lyons v. Globe Newspaper Co., 612 N.E.2d 1158, 1162 (Mass. 1993)).[5]

If the statements in question qualify as expressions of opinion, the court must turn "to the issue whether the expressions of opinion . . . were based on disclosed

_____

[5] This standard is similar in application to Federal Rule of Civil Procedure 56(a), under which summary judgment is appropriate if the statement(s) at issue do not create a genuine dispute of material fact.

nondefamatory facts or whether they implied 'that there are undisclosed facts on which the opinion is based.'" Id. (quoting Lyons, 612 N.E.2d at 1162). In performing this analysis:

> The court must "examine the statement in its totality in the context in which it was uttered or published. The court must consider all the words used, not merely a particular phrase or sentence. In addition, the court must give weight to cautionary terms used by the person publishing the statement. Finally, the court must consider all of the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to which it is published."

Id. (quoting Lyons, 612 N.E.2d at 1162); Phantom Touring, 953 F.2d at 727, 729-30.

The First Circuit has indicated that the bar on liability on for pure expressions of opinion is not only a matter of Massachusetts law, but also a requirement imposed by the United States Constitution. See Gray, 221 F.3d at 248; Riley, 292 F.3d at 289; Phantom Touring, 953 F.2d at 731 n.13. However, some statements in the case law imply that this constitutional bar is limited to cases involving matters of public concern or media defendants. See Milkovich, 497 U.S. at 19-20 (citing cases); Phantom Touring, 953 F.2d at 727. The instant case does not require a determination as to which of these approaches is correct because plaintiffs' status as public officials makes this a case of public concern. Cf. Milkovich, 497 U.S. at 15-16.

B.  Bartels's Statements Were Expressions of Opinion

Plaintiffs' slander claim is based, in essence, on the two main themes in Bartels's remarks to Carbone: that, in Bartels's view, plaintiffs acted unprofessionally during their encounter with Bartels at Louis and Elena's home; and that Bartels believed that Piccone might have known the location of Louis and Elena or of their children. See Complaint ¶29. Bartels's statements concerning both of these themes, considered "in [their] totality in the context in which [they were] uttered," Howell, 920 N.E.2d at 28 (quoting Lyons, 612 N.E.2d at 1162), were pure expressions of opinion that do not provide a basis for a valid defamation claim.

1.  *The Statement(s) that Plaintiffs Acted Unprofessionally*

Plaintiffs complain, first, that Bartels told Carbone that plaintiffs "addressed [Dalton Police Department] officers in an 'adversarial' way" and that the encounter between plaintiffs and Bartels "reached a 'fever pitch' and was 'unprofessional' and that [Bartels] was 'rubbed' the wrong way." Complaint ¶29. The statements by Bartels on this topic, as quoted earlier, do not present a question on which reasonable jurors could differ concerning whether plaintiffs have a valid defamation claim.

First, the factual assertions contained in Bartels's statements concerning plaintiffs' "professionalism" are not

disputed. For example, plaintiffs confirmed at their depositions that they, in Bartels's words, "didn't feel that [Bartels] had the authority to tell [plaintiffs] no you're not going into the house." See Piccone Dep. at 203-04; Quaglia Dep. at 62-63, 68.[6]

Other than undisputed facts, Bartels's remarks on this topic included: his statement that plaintiffs created "more of a hassle than [the police officers] needed to go through" (Conversation Tr. at 18, 19); his statement that plaintiffs could have "ma[de] things a little bit easier on [the officers]" (id. at 19); and his agreement with Carbone's statements that plaintiffs "really weren't too social" and that they had engaged in "clearly unprofessional conduct" (id. at 17, 19). Under Massachusetts law, the analysis of such statements first requires a determination as to whether they are "expressions of opinion." Howell, 920 N.E.2d at 28. This is "a determination of law for the court" if the statements are unambiguous. Id.

The statements in question are unambiguously expressions of opinion. The propositions that plaintiffs created more of a hassle than necessary, or were not "too social," or were "unprofessional," and that plaintiffs caused Bartels to "think"

_____

[6]     At her deposition, Piccone disputed the assertion that Quaglia had apologized to Bartels. See Piccone Dep. at 209-10. However, viewed in context, this statement was positive, not defamatory. In addition, Quaglia acknowledged at his deposition that he had apologized, although "in the same way that if a dentist was pulling a tooth and he hurt you; he'd sa[y], I'm sorry." Quaglia Dep. at 58, 60.

it was all "a little bit more than we needed to go through," cannot be conclusively proved or disproved by "objective evidence." <u>Levinsky's</u>, 127 F.3d at 130. Viewed in context, these remarks unambiguously conveyed Bartels's own assessment of plaintiffs' conduct, not any fact "susceptible of being proved true or false." <u>Phantom Touring</u>, 953 F.2d at 728.

The next question in the analysis of these statements is, therefore, whether Bartels implied that his opinions concerning plaintiffs were based on undisclosed, potentially defamatory facts. <u>See</u> <u>Howell</u>, 920 N.E.2d at 28; <u>Levinsky's</u>, 127 F.3d at 127. Reasonably construed, the statements in question do not imply the existence of undisclosed supporting facts. Rather, Bartels explained precisely the facts upon which his assessments were based. One of the stated bases for his opinion was the fact that, as quoted earlier, plaintiffs had "a lot of questions" concerning his authority and did not seem to "feel that [he] had the authority to tell them no you're not going into the house." Conversation Tr. at 18. In addition, Bartels explained that when plaintiffs arrived at Louis and Elena's home, they were slow, in his view, to identify themselves:

> BARTELS:  . . . They said hello. And I asked them who they were. And . . . there wasn't anything said. It was more like . . . they either didn't say anything or they asked who are you.
> CARBONE:  Mm hm.

> BARTELS: [And I] said no, I need to know who you --
> you are. And so finally after a debate, once they
> got outside of their vehicle . . . I said I don't
> know who you are. Uh I need to see some
> identification.

Id. at 13. Bartels's account is consistent with Piccone's own
description of the events. Her deposition testimony includes the
following question and answer:

> Q.  Did either Chief Bartels or then Officer Coe say
> anything to either you or to Mr. Quaglia before Mr.
> Quaglia identified himself to them?
>
> A.  I don't recall the specific order of when that
> exchange happened, but it was about us wanting to know
> who they were and they wanting to know who us were.

Piccone Dep. at 197-98.[7] Bartels's remarks do not imply that his
assessment of plaintiffs' behavior was based on reasons other
than those disclosed to Carbone. Indeed, it was Carbone, not
Bartels, who characterized plaintiffs' behavior, based on
Bartels's depictions, as not "too social" and "clearly
unprofessional." Conversation Tr. at 17, 19.

---

[7]    Piccone also stated at her deposition that she "[does
not] believe" that Quaglia was asked to identify himself before
he did so. See Piccone Dep. at 198. Quaglia, too, stated that
according to his recollection, he identified himself before he
had any verbal exchange with the officers. See Quaglia Dep. at
64-65. Accepting, for present purposes, the assumption that the
chronology remembered by plaintiffs is correct, this detail is
not at the heart of the defamatory statements attributed to
Bartels, but rather a non-actionable "minor inaccuracy." See
Riley, 292 F.3d at 296 (quoting Masson v. New Yorker Mag., Inc.,
501 U.S. 496, 516-17 (1991)); Murphy v. Boston Herald, Inc., 865
N.E.2d 746, 758 (Mass. 2007); Noonan, 556 F.3d at 28.

Moreover, Bartels's description of his encounter with plaintiffs was not one-sided. As quoted earlier, Bartels agreed with Carbone that plaintiffs' story had "pan[ned] out." Id. at 17. Bartels reported that Quaglia, to his credit, had apologized, and stated that he (Bartels) "can understand" that plaintiffs were under stress and had driven all night to get to Dalton. Id. at 20. In addition, Bartels noted that when Quaglia identified himself, he told Bartels that he "wasn't acting as an agent." Id. at 15, 17.

Therefore, Bartels, like the defendant in Phantom Touring, "not only discussed all the facts underlying his views but also gave information from which [his audience] might draw contrary conclusions." Phantom Touring, 953 F.2d at 730. As the First Circuit found in that case, "[b]ecause all sides of the issue, as well as the rationale for [defendant's] view, were exposed, [defendant's statements] reasonably could be understood only as [defendant's] personal conclusion about the information presented." Id.

In summary, Bartels's statements that plaintiffs had behaved "unprofessionally" can only reasonably be understood as expressions of opinion, not as statements of fact. These expressions of opinion can also not reasonably be understood to imply the existence of undisclosed, potentially defamatory

facts. Bartels is, therefore, entitled to summary judgment on plaintiffs' slander claim with regard to these statements.

### 2. *The Statement(s) that Plaintiffs May Know Louis and Elena's Location*

The second theme in Bartels's conversation with Carbone to which plaintiffs take exception is, in the words of the Complaint, that Bartels "inform[ed] DHS that he thought Piccone 'may know' the whereabouts of the Piccones' and/or their children." Complaint ¶29.

Bartels's remarks to Carbone on this topic, too, as quoted earlier, did not include actionable statements of fact or expressions of opinion that imply the existence of undisclosed, potentially defamatory facts.[8] First, Bartels did not assert, as fact, that Piccone knew where Louis and Elena are. His most emphatic statement on this matter was an affirmative answer to Carbone's inquiry as to whether it is "fair to presume that [Piccone] probably knows where [Louis and Elena] are." Id. at 22. The two qualifications in Carbone's question -- "fair to

_____

[8]     It is possible that Piccone did, in fact, know Louis and Elena's location. Bartels has submitted emails between Piccone, Louis, and Elena from the relevant time period that could support the inference that Piccone then knew where Louis and Elena were. See Def.'s SOF Exs. 7-11. The evidence in the record indicating that Piccone did not know Louis and Elena's location is Piccone's deposition testimony. See Piccone Dep. at 70. At trial, plaintiffs would be required to persuade a jury that Piccone's version of the facts is true. Making all reasonable inferences in plaintiffs' favor, a genuine dispute now exists concerning this matter. See Douglas, 433 F.3d at 145, 149. However, this dispute is not material.

presume" and "probably" -- are indications that Bartels's answer would be reasonably understood as his opinion, not as fact. See Howell, 920 N.E.2d at 28 ("the court must give weight to cautionary terms").

More importantly, Bartels stated repeatedly that he did not, in fact, "know" whether Piccone was aware of Louis and Elena's location. For example, he stated: "Do I know . . . specifically that I know they do? . . . No I don't know that. . . . [H]ow would I prove that they actually know where they are? . . . No, I don't." Conversation Tr. at 30. Bartels also explained that he was "assuming" that plaintiffs know where Louis and Elena are, but that this "assumption" was "circumstantial." Id. at 31, 32. Given these clarifications, Bartels's statements on this topic were unambiguously expressions of opinion.

Bartels's expressions of opinion concerning this matter also cannot reasonably be interpreted to imply the existence of undisclosed, potentially defamatory facts. Bartels stated that his opinion was "circumstantial," and he explained the circumstances that led him to form his opinion, namely Piccone's involvement in Louis and Elena's affairs since the early stages of the investigation and her appearance in Dalton to seek custody of Louis and Elena's children. Indeed, Bartels stated that he was "assuming that [plaintiffs] know where [Louis and

Elena] are, <u>only because</u> they're here . . . at the custody hearing that . . . Louis was summonsed to." Conversation Tr. at 31 (emphasis added).

Bartels, therefore, communicated unambiguously that his opinion that Piccone may know Louis and Elena's location was based only on disclosed facts. Accordingly, his statements about this matter also do not present a defamation claim that survives summary judgment. <u>See</u> <u>Gray</u>, 221 F.3d at 248; <u>Yohe</u>, 321 F.3d at 41.

### 3. *Other Statements*

Plaintiffs also attempt to support their defamation claim by reference to additional acts and statements by Bartels. First, the Complaint alleges that Bartels "provided copies of documents to DHS related to Louis and Elena which included warrants for their arrests and writs of habeas corpus for their three children." Complaint ¶30. However, plaintiffs concede that these documents were genuine. Bartels, therefore, made only true representations of fact by delivering the documents to the DHS.

Similarly, in their opposition to the motion for summary judgment, plaintiffs contend that Bartels defamed them by stating -- in addition to his expressions of opinion, discussed earlier -- that "there were outstanding warrants for Louis Piccone," that "the juvenile court had issued writs of habeas corpus as to the children," and that "the FBI was involved."

Pls.' Opp'n to Def.'s Mot. Summ. J. at 8.[9] However, plaintiffs do not contest the truth of these statements.

Finally, plaintiffs also seek to rely, rather than on Bartels's own statements, on the reports written by DHS personnel following Bartels's conversation with Carbone. For example, the Complaint's entire depiction of Bartels's statements to Carbone is based on a Memorandum of Activity written by Carbone. See Complaint ¶¶26, 29, Ex. A. In addition, plaintiffs' opposition to the motion for summary judgment quotes a report prepared by the DHS Joint Intake Center summarizing Carbone's Memorandum of Activity. See Pls.' Opp'n to Def.'s Mot. Summ. J. at at 9 (quoting Pls.' App'x Supp. Resp. to Def.'s SOF Ex. G).

Plaintiffs do not contend that Bartels would be liable for defamatory statements in these DHS reports that did not accurately present, in context, Bartels's own statements. However, they argue that the reports demonstrate that Bartels's

---

[9]     Plaintiffs also state, in their opposition to the motion for summary judgment, that Bartels communicated to Carbone that "the FBI was investigating plaintiffs." Pls.' Opp'n to Def.'s Mot. Summ. J. at 12. However, the transcript of the conversation between Bartels and Carbone shows unambiguously that Bartels was referring to the FBI in connection with the investigation of Louis and Elena, not in connection with any investigation of plaintiffs. Bartels told Carbone that he had already contacted the FBI, and that "it wasn't because of [DHS]" -- rather, Bartels stated that he was "just trying to do everything we can . . . to get the kids back . . . [a]nd get the Piccones apprehended." Conversation Tr. at 34.

comments could reasonably have been construed as statements of fact, and were understood in this manner by Carbone. This argument is not meritorious. Carbone's Memorandum of Activity reads, in pertinent part, as follows:

> [Bartels] felt that the encounter reached a "fever pitch" and was "unprofessional," but stated that the DHS employees never used their DHS authority inappropriately, and were honest as to their reasons for attempting to gain access to the [Piccone] family residence. [Bartels] was upset with the adversarial tone of their interactions, during the incident. [Bartels] stated that although he was "rubbed" the wrong way, Quaglia later apologized for the tense situation, and stated that they were all very tired about the family circumstances . . . . [Bartels] stated that [plaintiffs] left shortly thereafter in a[n] "amicable fashion."

> [Bartels] could not provide any specific information that would indicate that either DHS employee was assisting in harboring the fugitives . . . . [He] did not ask either DHS employee pointed questions as to the whereabouts of the children and/or the fugitives, but thought that Coleen Piccone "may know" their whereabouts.

Compl. Ex. A. at 2. Carbone's report is consistent with the court's analysis of Bartels's remarks, as described earlier. With regard to Bartels's complaint that plaintiffs had acted unprofessionally, Carbone's report states Bartels "felt" that the encounter had been "'unprofessional,'" that Bartels was "upset" with the adversarial tone of the interactions, and that Bartels had been "'rubbed' the wrong way." These characterizations unambiguously describe expressions of

Bartels's personal feelings and opinions rather than assertions of fact.

Similarly, Bartels's suspicion that Piccone and/or Quaglia knew Louis and Elena's location is reported by Carbone as conjecture, not fact. Carbone reported that Bartels "could not provide any specific information that would indicate that either DHS employee was assisting in harboring the fugitives." In addition, while it was Carbone's understanding that Bartels "thought that Coleen Piccone 'may know' [Louis and Elena's] whereabouts," the qualifications "thought" and "'may know'" in Carbone's report accurately reflect the fact that Bartels had related to Carbone his own uncertainty rather than concrete fact. See Howell, 920 N.E.2d at 28.

The DHS Joint Intake Center report quoted in plaintiffs' opposition to the motion for summary judgment provides only a succinct summary of Carbone's Memorandum of Activity and does not add any material facts or characterizations of its own. See Pls.' App'x Supp. Resp. to Def.'s SOF Ex. G (noting that Piccone's relatives were wanted on three counts of kidnapping a minor by a relative, and that Piccone and Quaglia "allegedly addressed Dalton Police Department (DPD) officers (in Dalton, MA) in an 'adversarial' way").

In summary, plaintiffs' additional allegations concerning their slander claim do not alter the conclusion that no

actionable statements of facts by Bartels are supported by evidence sufficient to withstand summary judgment.

      C.    <u>The Actual Malice Statute, and the Exception for Public Officials</u>

The Actual Malice Statute provides that "[t]he defendant in an action for writing or for publishing a libel may introduce in evidence the truth of the matter contained in the publication charged as libellous; and the truth shall be a justification unless actual malice is proved." Mass. Gen. Laws ch. 231, §92. Therefore, under the Actual Malice Statute, a plaintiff may recover damages even for true defamatory statements, so long as the defendant acted with "actual malice." <u>See</u> <u>Shay</u>, 702 F.3d at 82 (citing <u>White v. Blue Cross & Blue Shield of Mass., Inc.</u>, 809 N.E.2d 1034, 1036 n.4 (Mass. 2004)).

The term "actual malice" has a different meaning in the context of the Actual Malice Statute than it does for purposes of <u>New York Times v. Sullivan</u> and its progeny. In the context of the Actual Malice Statute, "actual malice" means "common-law malice," namely "ill will" or "malevolent intent." <u>See</u> <u>Noonan</u>, 556 F.3d at 29-30; <u>Coughlin v. Town of Arlington</u>, Civ. No. 10-10203-MLW, 2011 WL 6370932, at *14 (D. Mass. Dec. 19, 2011).

The protection accorded to pure expressions of opinion is closely related to the justification of "truth" referenced in the Actual Malice Statute, since the defining feature of an

opinion is that it is "not susceptible of being proved true or false." Phantom Touring, 953 F.2d at 728; Gray, 221 F.3d at 248. The text of the Actual Malice Statute does not make clear whether the statute is intended to permit liability for a pure expression of opinion if "actual malice is proved." This question also has not been addressed by the case law. The principle that the statute codifies -- that damaging statements that are not generally actionable may create liability if they are made malevolently -- is arguably equally applicable to pure opinions and to true statements of fact. In any event, as a practical matter, even assuming, without finding, that the Actual Malice Statute is applicable to expressions of opinion, it cannot be applied in the instant case for the reasons explained below.

The Actual Malice Statute may not apply in the instant case because, according to several authorities, the statute applies only to libel actions, not to slander actions. A 1943 decision of the Massachusetts Supreme Judicial Court (the "SJC") states, without elaboration, that "[the Actual Malice Statute], by force of which actual malice deprives a defendant of the benefit of this defence in an action for libel does not apply to an action for slander." Bander v. Metro. Life Ins. Co., 47 N.E.2d 595, 598-99 (Mass. 1943). Other, older decisions state, without referring specifically to the Actual Malice Statute, that while

truth is only a defense to libel "in the absence of malice," in a slander action it is "a complete defence." <u>Comerford v. Meier</u>, 19 N.E.2d 711, 714 (Mass. 1939); <u>Warner v. Fuller</u>, 139 N.E. 811, 813 (Mass. 1923). In one recent case, after stating that "[t]o prevail on a claim of defamation, a plaintiff must establish that the defendant was at fault for the publication of a false statement," the SJC added in a footnote that: "By statute, Massachusetts permits a plaintiff to recover for a truthful defamatory statement published in writing (or its equivalent) with actual malice." <u>White</u>, 809 N.E.2d at 1036 n.4. The SJC did not, in <u>White</u>, elaborate on the "equivalents" of publishing in writing or on the reason why such modes of publication should be treated differently.

In any event, even if the Actual Malice Statute is applicable to slander cases, the First Amendment does not permit plaintiffs to recover on the basis of it. The SJC has explained that "[w]here the plaintiff is deemed a 'public figure,' . . . the First Amendment 'absolutely prohibits punishment of truthful criticism.'" <u>Shaari v. Harvard Student Agencies, Inc.</u>, 691 N.E.2d 925, 927 (quoting <u>Garrison</u>, 379 U.S. at 78). Consequently, it has held that "a judge cannot constitutionally apply [the Actual Malice Statute] to a public figure or public

official." <u>Materia v. Huff</u>, 475 N.E.2d 1212, 1216 n.6 (Mass. 1985).[10]

The analysis of whether a plaintiff is a public official is not governed "by reference to state-law standards." <u>Rosenblatt v. Baer</u>, 383 U.S. 75, 84 (1966). Rather, it is governed by federal law. <u>Id.</u> The protection of "public officials" provided by federal law is rooted in the First Amendment's "strong interest in debate on public issues, and . . . strong interest in debate about those persons who are in a position significantly to influence the resolution of those issues." <u>Id.</u> at 85. Therefore, "[g]enerally speaking, the ['public official'] classification embraces only those public employees with 'substantial responsibility for or control over the conduct of governmental affairs.'" <u>Kassel v. Gannett Co.</u>, 875 F.2d 935, 939 (1st Cir. 1989) (quoting <u>Rosenblatt</u>, 383 U.S. at 85).

"The [Supreme] Court 'has not provided precise boundaries for the category of "public official,"' nor has it determined 'how far down into the lower ranks of government employees' the

_____

[10] It is not necessary to determine whether plaintiffs are also "public figures." "[P]ublic-figure status has the same legal ramifications as public-official status -- but the two terms are not synonymous. . . . Public figures may or may not be public officials; they are persons who 'have assumed roles of especial prominence in the affairs of society.' Commonly, 'those classified as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.'" <u>Mandel</u>, 456 F.3d at 202 (quoting <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323, 345 (1974)).

designation should extend." Id. (quoting Hutchinson v. Proxmire,
443 U.S. 111, 119 n.8 (1979)); Fiacco, 528 F.3d at 99. The First
Circuit has provided more detailed guidance, holding that courts
should:

> approach the public-official analysis as if it were a
> three-legged stool, taking into account: (i) the
> extent to which the inherent attributes of a position
> define it as one of influence over issues of public
> importance; (ii) the position's special access to the
> media as a means of self-help; and (iii) the risk of
> diminished privacy assumed upon taking the position.

Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 204 (1st Cir.
2006); Kassel, 875 F.2d at 939-41; Fiacco, 528 F.3d at 99.[11]

When the Supreme Court first imposed constitutional limits
on defamation suits by public officials in New York Times v.
Sullivan, it spoke specifically of suits "brought by . . .
public official[s] against critics of [their] official conduct."
376 U.S. at 256, 264, 283. However, the Court has recognized in

---

[11]    Some of the language of Fiacco suggests that an
individual is only a public official if each of the three legs
of the "stool" is demonstrated. See 528 F.3d at 99. This view
runs counter to the general thrust of the case law, which
indicates that the public-official analysis should be attuned to
the specific circumstances of each particular case, Mandel, 456
F.3d at 207 (citing Pendleton, 156 F.3d at 70), and that the
three legs are to be "tak[en] into account," id. at 204. In
addition, the metaphor of the three-legged stool itself evokes
an analysis in which the relevant factors may play different
roles, rather than a checklist of requirements that must be
satisfied. The court assumes that the language to the contrary
in Fiacco results from the fact that in that case, evidence was
presented establishing each of the three legs. See 528 F.3d at
99-101.

subsequent cases that "society's interest in the officers of government is not strictly limited to the formal discharge of official duties." Gertz, 418 U.S. at 344-45. In Garrison, a case concerning statements made about state court judges, the Court rejected the distinction drawn by the Louisiana Supreme Court between criticisms of the manner in which the judges had conducted their judicial business and "personal attacks upon the[ir] integrity and honesty." Garrison, 379 U.S. at 76. The Court held, in the passage quoted earlier, that: "The public-official rule protects the paramount public interest in a free flow of information to the people concerning public officials, their servants. To this end, anything which might touch on an official's fitness for office is relevant." Id. at 77; Monitor Patriot Co. v. Roy, 401 U.S. 265, 273-74 (1971).

Accordingly, "[t]he protection of the actual-malice test extends to erroneous statements that in any way 'might touch on . . . (the) fitness for office' of a public official." Time, Inc. v. Firestone, 424 U.S. 448, 472 (1976) (quoting Garrison, 379 U.S. at 77). Applying this holding, the First Circuit invalidated a Puerto Rick statute that "permit[ted] an unqualified affirmative defense of truth, but . . . only if the victim 'is a public officer and the charge made refers to the performance of his duties.'" Mangual v. Rotger-Sabat, 317 F.3d 45, 67 (1st Cir. 2003). The First Circuit reasoned that "[u]nder

Garrison, the public officials exception does not extend only to the discharge of official duties, but to 'anything which might touch on an official's fitness for office,' including 'dishonesty, malfeasance, or improper motivation.'" Id. (quoting Garrison, 379 U.S. at 77).

Other decisions have explained that a broad range of information "might touch on an official's fitness for office." Discussing a plaintiff who was a candidate for public office, the Supreme Court stated that "it is by no means easy to see what statements about a candidate might be altogether without relevance to his fitness for the office he seeks." Monitor Patriot, 401 U.S. at 275. The First Circuit wrote recently that:

> So many things can "touch on" someone's "fitness for office" that this restriction to the actual malice standard is very rarely applied. Buendorf v. Nat'l Pub. Radio, Inc., 822 F. Supp. 6, 12 (D.D.C. 1993) ("The Supreme Court and lower courts have construed the rule of New York Times Co. v. Sullivan to include almost any comment regarding a public official."); see also, e.g., Soke v. Plain Dealer, 632 N.E.2d 1282, 1284 (Ohio 1994) (whether off-duty police officer lied under oath related to his fitness for office); Roche v. Egan, 433 A.2d 757, 758, 762-64 (Me. 1981) (letter alleging off-duty police officer had "violent temper, threatened little children, [and] kicked pets" related to his fitness for office).

Dixon v. Int'l Bhd. of Police Officers, 504 F.3d 73, 88 (1st Cir. 2007).

The determination of whether a plaintiff is a public official is "ultimately a question of law" and, therefore,

"normally . . . 'grist for the court's -- not the jury's -- mill.'" <u>Mandel</u>, 456 F.3d at 204 (quoting <u>Pendleton v. City of Haverhill</u>, 156 F.3d 57, 67 (1st Cir. 1998)). "[I]t is often perfectly reasonable to attempt to decide whether a plaintiff is a public official or public figure during pretrial proceedings." <u>Id.</u> at 204. However, on summary judgment, the court is limited by "the constraints of Rule 56," which do not permit it to make "[c]redibility determinations" or to "weigh[] the evidence." <u>Id.</u> at 206 (quoting <u>Anderson</u>, 477 U.S. at 255). As a result, the court must refrain from reaching a premature conclusion concerning a plaintiff's status where "the factual record, at the summary judgment stage, [is] too uncertain to warrant a legal conclusion either way." <u>Id.</u> at 205. The record may be inadequate to support a conclusion where it is "disturbingly thin," contains "gaps," or "give[s] rise to conflicting inferences," especially if "better evidence [is] readily available." <u>Id.</u> at 205-06.

D. <u>Piccone and Quaglia Are Public Officials</u>

The Complaint alleges that Bartels made his statements to Carbone "out of malice." Complaint ¶67; <u>see</u> <u>also</u> <u>id.</u> ¶¶30, 38. Viewed in the light most favorable to them, plaintiffs have presented evidence that is sufficient to permit a reasonable fact finder to conclude that Bartels was motivated by "ill will" or "malevolent intent." For example, Piccone testified at her

deposition that when she and Quaglia questioned Bartels's authority to prevent them from entering Louis and Elena's house, "Bartels was livid. He went red." Piccone Tr. at 203. Bartels himself acknowledged at deposition that he had considered plaintiffs to be "shitbags." Bartels Dep. at 211.

In addition, the record includes the transcript of a telephone conversation that Bartels had with State Trooper Richard Smith soon before Bartels spoke to Carbone. See Pls.' App'x Supp. Resp. to Def.'s SOF Ex. C. In that conversation, Bartels told Smith that plaintiffs are "telling everybody what to do. That -- that's what really gets my ass out." Id. at 5. At the end of the conversation, Smith suggested that Bartels "[m]ake calls to INS, get someone fired, do something," to which Bartels responded "OK. Thank you." Id. Finally, in the course of his conversation with Carbone, Bartels stated: "The more I rattle that family's tree . . . [t]he better I'm going to feel because I just feel like uh OK they're going to do exactly what the Christ they want to." Conversation Tr. at 29.

Plaintiffs have, therefore, presented evidence sufficient to create a genuine dispute as to whether Bartels made his statements to Carbone with "actual malice" in relevant sense. However, as explained earlier, the Actual Malice Statute does not apply if plaintiffs are "public officials." See Materia, 475

N.E.2d at 1216 n.6; <u>Shaari</u>, 691 N.E.2d at 927; <u>Garrison</u>, 379 U.S. at 78; <u>Milkovich</u>, 497 U.S. at 20.

In the instant case, the evidence material to the question of whether Piccone and Quaglia are public officials is not disputed. Indeed, all of the relevant evidence was provided by Piccone and Quaglia themselves. This evidence is sufficient to compel the conclusion that both Piccone and Quaglia are public officials under the standards defined by the First Circuit. Unlike the record in <u>Mandel</u>, the record here is not "disturbingly thin," but rather includes detailed information about, among other things, "the attributes inherent in [plaintiffs'] position[s]." <u>Mandel</u>, 456 F.3d at 205. The information available in this case is consistent, and does not, therefore, require a "judgment call" between divergent inferences. <u>Id.</u> at 206. There is also no indication that "better evidence [i]s readily obtainable." <u>Id.</u> Thus, this is not a "case[] in which 'it [is] not . . . possible to resolve the [public-figure] issue until trial." <u>Id.</u> at 204 (quoting <u>Miller v. Transam. Press, Inc.</u>, 621 F.2d 721, 724 (5th Cir. 1980).

The undisputed facts concerning Piccone's position include the following. As indicated earlier, Piccone is the Deputy Associate Chief Counsel to CBP in New York. <u>See</u> Piccone Dep. at 113. Her office provides counsel to CBP on various topics. Among other things, the office "deal[s] with all enforcement issues

involved with things and people entering and leaving the united States Border," including "guns, drugs, money, people, anything." Id. at 126. The enforcement activities of her office also concern terrorism. Id. In addition, Piccone's office works on issues related to trade, namely "[a]ll goods that are being imported and exported from the United States." Id.

Piccone is a "senior employee" in the DHS hierarchy, and she "perform[s] a very important role within [her] particular office." Id. at 161, 133. Her pay grade is 15 -- the highest pay grade in the General Schedule, which is the pay scale of the United States civil service. Id. She "passed a rigorous security clearance for her job." Def.s' SOF Ex. 12, at 2.

Piccone's primary "clients" include JFK airport, Newark airport, and Port Newark-Elizabeth Seaport, which is "the largest containment seaport for goods entering and leaving the Northeastern United States." Piccone Dep. at 127. Piccone supervises employees, including, when her own supervisor is unavailable, the entire New York office. Id. at 45, 127, 133. She "give[s] a lot of training," including ethics training and training to FBI agents, both approximately once a year. Id. at 126, 138-40. Piccone has been invited to speak at "very big events." Id. at 136-37. In January, 2008, she spoke to a congressional subcommittee on a matter related, according to her recollection, to terrorism. Id. at 137.

In addition to her regular duties, Piccone sometime works on special assignments -- "pet headquarters project[s] where you're getting interface with the high-up executives at CBP, foreign travel, foreign training." Id. at 128. She has had "multiple foreign assignments" involving foreign travel. Id. at 167. From late 2007 and throughout 2008, Piccone "was assigned to work on a headquarters project with the Secret Service." Id. In 2012, she was assigned a project described as a "disciplinary matter . . . a management inquiry issue," which required travel to Texas. Id. at 130-31. That assignment required seniority and experience, was sensitive in nature, and could not have been assigned to less than a Deputy. Id. at 131-33.

The undisputed facts concerning Quaglia include the following. Quaglia is the Special Agent in Charge for the CBP's Office of Internal Affairs in New York. See Quaglia Dep. at 9. His position requires "a great deal of integrity." Id. at 28. Quaglia oversees all investigations conducted by the New York office. The New York office covers most of the Northeast, and conducts about 30-40 investigations per year. Id. at 9-11. Quaglia currently supervises eight employees. Id. at 13. His appointment to his position was conditioned on completion of a favorable background investigation. Id. at 20. Quaglia is, in his own words, "in a very high-level position." Id. at 36. Like

Piccone, he is "at the top of the salary range," at Grade 15 on the General Schedule. Id. at 48, 50.

Based on these undisputed facts, the court concludes that, as a matter of law, Piccone and Quaglia are public officials. First, they both fit the case law's general descriptions of public officials, in that they have "substantial responsibility for . . . the conduct of governmental affairs." Rosenblatt, 383 U.S. at 85; Kassel, 875 F.2d at 939. Piccone occupies a high-level position in the legal arm of a federal agency entrusted with, among other things, protection of the country's borders. Quaglia oversees internal investigations of federal employees in the same agency. They both have supervisory responsibilities. In short, they hold positions sufficiently important to "invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." Rosenblatt, 383 U.S. at 86; Kassel, 875 F.2d at 939; Mangual, 317 F.3d at 66.

The importance of Piccone and Quaglia's positions is relevant first and foremost to the first leg of the First Circuit's "three-legged stool" -- "the extent to which the inherent attributes of a position define it as one of influence over issues of public importance." Mandel, 456 F.3d at 204; Kassel, 875 F.2d at 939. It also affects the third prong of the test -- "the risk of diminished privacy assumed upon taking the

44

position" -- because "[p]ersons who actively seek positions of influence in public life do so with the knowledge that, if successful in attaining their goals, diminished privacy will result." Id. at 940; Gertz, 418 U.S. at 344. Other information relevant to this prong is the fact that both Piccone and Quaglia were required to undergo background investigations in order to assume their respective positions. See Quaglia Dep. at 20; Def.'s SOF Ex. 12, at 2 (Piccone).

There is little information in the record concerning the second prong of the test -- "the position's special access to the media as a means of self-help." Mandel, 456 F.3d at 204; Kassel, 875 F.2d at 939-40. To some degree, the importance of plaintiffs' respective positions supports the inference that the media would be receptive to information provided by them. In addition, a related lawsuit filed by Piccone against New York law enforcement officials, concerning a warrantless search of her house for Louis and Elena's children, received some media coverage. See Piccone Dep. at 145. However, the degree to which that coverage was related to Piccone's government position is unclear. In any event, this is not a case in which the "evidence . . . point[s] in different directions," Mandel, 456 F.3d at 205, because there is no evidence in the record that undermines the inference that plaintiffs' positions generate increased access to the media. Moreover, the importance of plaintiffs'

access to the media is limited in this case because the alleged defamation was not in statements made to the media.

Although the analysis of whether a plaintiff is a public official "is necessarily a factbound one," id. at 207 (citing Pendleton, 156 F.3d at 70), the case law supports the conclusion that Piccone and Quaglia are public officials. Courts generally deem police officers to be public officials. See Mangual, 317 at 66 (collecting cases); Dixon, 504 F.3d at 88 (citing Rotkiewicz v. Sadowsky, 730 N.E.2d 282, 287 (Mass. 2000)); Elder, Defamation: A Lawyer's Guide §5:1 & n.120 (concluding that "the overwhelming majority of the cases" classify "garden variety police officers" as public officials). Higher-level law enforcement officers, like Quaglia, have also been found to be public officials. See Price v. Viking Penguin, Inc., 881 F.2d 1426, 1429-31 (8th Cir. 1989) (FBI special agent assigned to an Indian reservation); Pape v. Time, Inc., 354 F.2d 558, 560 (7th Cir. 1965) (deputy chief of detectives of Chicago); Crane v. Arizona Rep., 729 F. Supp. 698, 708 (C.D. Cal. 1989) (head of the Los Angeles branch of the federal Organized Crime Strike Force); Travelers Ins. Co. v. Handleman Co., 797 F. Supp. 579, 587 (E.D. Mich. 1992) (captain of police and head of narcotics unit); Otepka v. New York Times Co., 379 F. Supp. 541, 542-43 (D. Md. 1973) (chief security evaluator at the Department of State), aff'd, 502 F.2d 1163 (4th Cir. 1974).

As for government lawyers like Piccone, the First Circuit has noted that "[w]hat little case law there is" suggests that an "assistant state's attorney (or someone in a comparable position) . . . might be a public official." Mandel, 456 F.3d at 206. Assistant state attorneys "mak[e] decisions whether to [nolle prosse] a case, dismiss a case, . . . go forward with a case, [and] what kind of sentence to ask for." Id. (second alteration in original); see also Matta v. May, 888 F. Supp. 808, 812 (S.D. Tex. 1995) (assistant regional administrator of the SEC's Houston Branch Office); Johnson v. Black Chronicle, Inc., 964 P.2d 924, 926 (Okla. Civ. App. 1998) (attorney and executive director of the state human rights commission); Weingarten v. Block, 102 Cal. App. 3d 129 (1980) (former city attorney and counsel for the city urban redevelopment agency).

Plaintiffs argue that they should not be classified as public officials because their "interchange with Bartels was a completely private matter which had nothing to do with their employment with the DHS." Pls.' Opp'n to Def.'s Mot. Summ. J. at 9. This argument is not meritorious. As explained earlier, "[t]he public officials exception does not extend only to the discharge of official duties, but to 'anything which might touch on an official's fitness for office,' including 'dishonesty, malfeasance, or improper motivation.'" Mangual, 317 F.3d at 67 (quoting Garrison, 379 U.S. at 77); Time, 424 U.S. at 472; see

also <u>Kassel</u>, 875 F.2d at 939 ("public official" status hinges on "[t]he inherent attributes of the position, not the occurrence of random events").[12] The information that Bartels brought to the attention of the DHS concerning plaintiffs' level of "professionalism" and the possibility that Piccone knew the location of wanted individuals could have touched on plaintiffs' fitness for office. This conclusion is illustrated by, among other things, the fact that the information provided by Bartels led to three internal investigations, and the fact that plaintiffs believe that Bartels's call to Carbone has affected their respective careers.

In summary, the undisputed evidence is sufficient to establish, as a matter of law, that Piccone and Quaglia are each a public official. Consequently, the constitutional constraints of <u>New York Times v. Sullivan</u> do not permit them to prevail on their defamation claim on the basis of Massachusetts's Actual Malice Statute.

V. INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONS

As described earlier, the other Count remaining in plaintiffs' Complaint alleges Interference with Advantageous

---

[12] The related status of "public figure," on the other hand, is "commonly" conferred on individuals who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.'" <u>Mandel</u>, 456 F.3d at 202 (quoting <u>Gertz</u>, 418 U.S. at 345).

Business Relations. The elements of a cause of action for IABR
are:

> (1) a business relationship or contemplated contract
> of economic benefit; (2) the defendant's knowledge of
> such relationship; (3) the defendant's interference
> with it through improper motive or means; and (4) the
> plaintiff's loss of advantage directly resulting from
> the defendant's conduct.

Am. Private Line Servs., Inc. v. Eastern Microwave, Inc., 980
F.2d 33, 36 (1st Cir. 1992) (citing United Truck Leasing Corp.
v. Geltman, 551 N.E.2d 20, 22 (Mass. 1990)); Doyle v. Hasbro,
Inc., 103 F.3d 186, 195-96 (1st Cir. 1996).

Bartels argues that plaintiffs' IABR claim cannot succeed
because, first, "[p]laintiffs' employment relationships have not
been severed." Def.'s Mem. Supp. Mot. Summ. J. at 31. It is true
that some precedents state that IABR requires that the
plaintiff's advantageous business relations be broken. E.g.,
Coughlin, 2011 WL 6370932, at *13. However, in the current case,
the court adopted the Magistrate Judge's conclusion that, in
order to prevail on an IABR claim, plaintiffs are not required
to show that their advantageous relations with DHS have been
severed. See Piccone, 2012 WL 4592770, at *10 (citing cases).
This ruling forms part of the law of the case. See Lacy v.
Gardino, 791 F.2d 980, 984 (1st Cir. 1986); Martins v. Bicknell
& Fuller Corrugated Container Corps., Civ. No. 84-482-WF, 1988
WL 9294, at *2 (D. Mass. Feb. 1, 1988). Bartels has not

identified any reason for the court to reconsider its previous ruling.

Bartels also argues that plaintiffs cannot prove any "loss of advantage." Def.'s Mem. Supp. Mot. Summ. J. at 31. Plaintiffs' evidence concerning their injury is primarily an expert report of George D. Heavey, who worked for many years in federal law enforcement. Mr. Heavey opines that the internal investigations prompted by Bartels's conversation with Carbone "ha[ve] caused and continue[] to cause both Ms. Piccone and Mr. Quaglia extreme professional reputational damage which will shadow them throughout the remainder of their careers both in the government and private sectors." Pls.' Appx. Supp. Resp. to Def.'s SOF Ex. K, at 2. Arguably, Mr. Heavey's opinion suffices to place the question of whether plaintiffs have suffered loss of advantage in genuine dispute.

Nevertheless, summary judgment against plaintiffs on their IABR claim is warranted. In Hustler Magazine v. Falwell, 485 U.S. 46 (1988), the Supreme Court held that the constitutional protections defined in New York Times v. Sullivan are not limited to the context of defamation law. Falwell concerned a suit for intentional infliction of emotional distress. As paraphrased by the First Circuit, the Supreme Court held in Falwell that "where the distress is alleged to have been caused by published speech . . . public officials and public figures

50

may only recover if they can prove that the publication that
harmed them contained a false statement of fact that was made
with actual malice." Fiacco, 528 F.3d at 99 (discussing Falwell,
485 U.S. at 56). Other circuits have extended the reasoning of
Falwell to additional torts beyond the infliction of emotional
distress, including IABR. As the Sixth Circuit has explained:

> Following the Supreme Court's lead in Falwell, the
> circuit courts have likewise imposed the actual-malice
> standard on other tort claims predicated on defamatory
> speech, recognizing that "a plaintiff may not avoid
> the protection afforded by the Constitution
> . . . merely by the use of creative pleading." Beverly
> Hills Foodland, Inc. v. United Food and Commercial
> Workers Union, Local 655, 39 F.3d 191, 196 (8th Cir.
> 1994) (noting that the actual-malice standard required
> for an actionable defamation claim "must equally be
> met for a tortious interference claim based on the
> same conduct or statements"). See, e.g., Jefferson
> County Sch. Dist. v. Moody's Investor's Services,
> Inc., 175 F.3d 848, 856–58 (10th Cir. 1999) (rejecting
> plaintiff's tort claims for interference with
> contractual and business relationships because those
> claims were based on speech protected by the First
> Amendment); Unelko Corp. v. Rooney, 912 F.2d 1049,
> 1057–58 (9th Cir. 1990) (acknowledging that the
> plaintiff's tort claims for product disparagement,
> trade libel, and tortious interference with business
> relationships were "subject to the same [F]irst
> [A]mendment requirements that govern actions for
> defamation").

Compuware v. Moody's Investors Servs., Inc., 499 F.3d 520, 530
(6th Cir. 2007); see also Dongguk Univ. v. Yale Univ., 734 F.3d
113, 129 (2d Cir. 2013).

The First Circuit has followed Falwell in a case involving
intentional infliction of emotional distress. See Fiacco, 528

51

F.3d at 98-102. It has not yet applied <u>Falwell</u> to other torts. However, the First Circuit has stated generally that "there exists ample precedent for applying <u>New York Times</u> requirements to falsehood claims beyond defamation." <u>Emerito Estrada Rivera-Isuzu de P.R., Inc. v. Consumers Union of U.S., Inc.</u>, 233 F.3d 24, 28 (1st Cir. 2000). In addition, it has explained that <u>Falwell</u> is designed to prevent plaintiffs from "recycl[ing]" a "failed defamation claim," <u>Shay</u>, 702 F.3d at 83, or from "evad[ing]" constitutional requirements by asserting additional claims "premised on precisely the same facts as [the] defamation claim," <u>Yohe</u>, 321 F.3d at 44. These statements indicate that the First Circuit would agree with the circuits that have applied <u>Falwell</u> to other torts, including IABR.

For the reasons explained earlier, the statements by Bartels complained about by plaintiffs are expressions of opinion, which cannot be proven to be "false statement[s] of fact that [were] made with actual malice." <u>Fiacco</u>, 528 F.3d at 99. Liability in defamation for these statements is, therefore, constitutionally prohibited for public officials like plaintiffs. See <u>Milkovich</u>, 497 U.S. at 20; <u>Riley</u>, 292 F.3d at 289; <u>Phantom Touring</u>, 953 F.2d at 731 n.13; <u>Shaari</u>, 691 N.E.2d at 927.

Plaintiffs' IABR claim is "premised on precisely the same facts as [the] defamation claim." <u>Yohe</u>, 321 F.3d at 44. Because

<u>Falwell</u> is properly understood to extend to IABR claims, plaintiffs cannot evade the constitutional doctrines that bar their defamation claim by reshaping the same claim as an IABR claim. Accordingly, summary judgment in Bartels's favor is justified on the IABR claim as well.

## VI. ORDER

In view of the foregoing, it is hereby ORDERED that Bartels's Motion for Summary Judgment (Docket No. 60) is ALLOWED. Judgment shall, therefore, enter for Bartels on plaintiffs' remaining claims.

/s/ Mark L. Wolf
_____
UNITED STATES DISTRICT JUDGE
